This is the United States of America v. Ulbricht. May I proceed, Your Honor? Thank you. May it please the Court, I'm Joshua Draytel, I represent the appellant Ross Ulbricht. And it's a natural question to ask why and whether  the trial made a difference in light of all the evidence that the government presented. And here's why these errors mattered and why they denied Mr. Ulbricht a fair trial. The government got to present its case but the defense was not afforded the same opportunity. Thus, of course, all the government's evidence looks uncontested and very good. But starting before the trial and throughout the trial, there was preclusion of every effort that the defense made to mount a defense. And the first is the evidence of the agent's corruption. And the essence of the defense was that the digital evidence that was presented, a lot of it from the Silk Road site itself, and from other sources as well, was not reliable, was susceptible to manipulation and fabrication. And not necessarily by the government, but by any evidence either presented or proffered, even with the experts that were precluded, that there was any fabrication or any manipulation or any alteration of that digital evidence. Yes, in the sense that, first of all, the infiltration of the two corrupt agents, and even before trial, we were only alerted as to one and we weren't even allowed to use that one. But they... Even today, having now heard about these agents in as much detail as we all know, is there any actual evidence that's been developed that they did interfere with or even have the capacity to interfere with this evidence? Yes. They had administrative privileges. Yes, but what was the extent of the administrative privileges? And the government doesn't know quite for sure because a lot of it is... If you don't have it in real time, you don't know. But the other part is that they hijacked accounts, they changed passwords, they stole money. They were inside the guts of this website. Were they inside the guts of Mr. Ulbricht's laptop? No, but that's another issue that we were not allowed to explore. The government crashed Mr. Ulbricht's laptop when they seized it, so that the processes that are running on that laptop are no longer available. That's why we needed an expert to talk about what the screenshots would show. There were open internet ports, a BitTorrent program, which is a program that is rife with viruses and infiltration from the outside. I was not permitted to cross-examine on that issue. That was closed. How was any of the material about Forrest exculpatory? Of all the information you finally obtained about Forrest and his corruption, how was it exculpatory? Because he was selling information to Dred Pirate Roberts under a variety of different aliases. So what? How does that show your client didn't do these crimes? Because it shows that the real DPR had knowledge about this progress of the investigation in the early part of 2013. And then you have a series of events that set up an exit strategy for Dred Pirate Roberts to get out. And all of this is material that we were not permitted to develop. The government cited grand jury secrecy, yet they'd already interviewed the two agents. And again, we only heard about one agent. And these are all issues that... You have to take these things one at a time and actually try to understand what's happening. The second agent, what is the evidence about him that is different than the evidence about Forrest that would have bolstered this argument? He was a computer expert who was schooled in identity theft and a whole range of other expertise that goes directly to what the defense was about and is connected to all of these... He's also someone... These are two agents who the evidence established, and we didn't have this before trial, which is that they also had a capacity for... And not just capacity, they did try to impose responsibility and guilt on others who were not responsible. So what they did to Curtis Green, Flush, with respect to him, and they made it seem like he was the one who stole the money. And they never revealed that they stole the money. So he was left out to dry. They were going to take away his $5,000. He was going to go to jail. He was going to take all the responsibility for this case, for that theft. And we have the other side of that coin right here with respect to Ross Elbert. So for us, this is a critical issue, and what we wanted was the chance to put it in front of the jury. Was your expert going to say, in my opinion, that there was identity theft? Excuse me? Was your expert going to say, in my opinion, there was identity theft? No, he was going to say what we could gain from the computer, from what was left after the government crashed. That what was on the computer... That this was a vulnerable situation, that there are tools that could infiltrate this computer, that metadata... Because the government made a big deal about when all these documents were created on the computer, and the dates. And the jury didn't know computers in this day and age can be hacked? They didn't know that? But, Your Honor, this computer. That this computer was in a very vulnerable state. You don't know that every computer, the NSA, gets hacked? We weren't allowed to really get into that. You know, I asked... But don't they know that? Do they need an expert to tell them a computer can be hacked? I think they needed an expert to show them that that computer was in a position to be hacked, because the government's claim was, where's any evidence that this could have occurred? And so we were left... All we wanted was the chance to show it. Did you ever disclose what Antonopoulos was going to testify? Yes. Yes, we did. What did you say? How specific were you about the disclosure? We were specific... We were specific that he was going to... Well, he's a Bitcoin expert, so that's a different expert. But he was going to contest what their witness, what the government's witness had said. And he was going to establish that the government's witness had all the concepts wrong, because he's not a Bitcoin expert, and that the spreadsheet that we got two days earlier, and we gave our notice within 48 hours. And so, you know, the timeliness issue, I think... But in your opening statement, you mentioned this Bitcoin aspect. Yes. Yes. How was this a surprise then? Why didn't you disclose Antonopoulos earlier? Because we didn't have to. They had a large gap. They were the ones who surprised us. You didn't have to? We don't have to have an expert if they don't have the evidence. They produced the evidence in the middle of the trial. But you're supposed to disclose one, aren't you? If we're going to call them, but we didn't... But the government produced this, and we produced... And all of the Hornbeck standards for experts, I think, were met. But I'd like to get to sentencing in the time that I have left. And there was procedural and substantive unreasonableness. The procedural unreasonableness created the opportunity for substantive unreasonableness. And it was that the court departed from any standards so that it could consider matters that gave it a justification for a life sentence, a life sentence for a 30-year-old with no prior criminal record who basically had the same position as a landlord. There are statutes, 856. If the landlord in a crack house case had ordered five people to be murdered, would you think that that would be a case in which the sentence would be dictated by the fact that he was merely an accomplice in the underlying drug sales? I think there are two issues to that. The first is the proof as to the murders for hire. They never happened. The government knows they never happened. They never found a person even by the name. This is like a Valley case, which is not in our brief, but the Valley case, V-A-L-L-E, that the court decided last year, 807-508, F-3-508, about internet chats. We can't... Was there not evidence that he paid $650,000 worth of Bitcoin to someone who had represented that he killed people at the orders of Dread Pirate Roberts? That, again, that we can't elevate... Yes, yes, yes, yes, but only in the sense of what's on an internet chat room. We can't elevate that. Wait, wait, wait, I don't understand this. It's one thing to say, in a fantasy chat, I'd like to kill everybody that I don't like. It's a different thing to actually pay money to someone. We have no idea whether or not that was actually what the money was paid for because there's no evidence that anything ever occurred. We don't know whether it was an extortion plot. Why does it matter? It could have been the agents. It could have been the agents getting the money. Why does it matter whether it happened or not? Why does it matter if the person who was being paid the money was pretending the whole time in order to defraud the head of the Silk Road? No, I don't mean that, necessarily. I mean that both sides, it could have been a way for the agents to get their money out of the, or someone else to get their money out of Silk Road. We don't know. The agents had encrypted chats that have never been decrypted. They've never given up their encryption keys. Also, that's a 20-year-to-life statute. I'm sorry, that's a 10-year statute, murder for hire, if no death results, if there's no injury. That's a 10-year statute, 1958. 841, the statute with death results. I appreciate that we have some weird sentencing laws where murder for hire that's unconsummated is treated by Congress as less severe than dealing lots of drugs, but the fact is, the crimes of which the defendant was committed did carry a maximum life sentence, did they not? Yes, but- And have not, I mean, going back to Herbie Sperling in 1970, whatever, there are cases of 848 kingpin defendants getting life sentences. Yes, but we have the statistics in our brief in terms of the number of the percentage of people doing life sentences. This is a percentage of narcotics sentences, meaning all the way down to some guy on the street. No, no, no, it includes all of them, 2.5%. I understand it, yes, but what is that 2.5% of? Is that 2.5%? All, all. Yes, exactly. It's not 2.5% of Section 848 kingpin defendants, is it? No, but for narcotics, it's even lower. It's less than a percent. It's, it's, for narcotics defendants, all- For narcotics defendants convicted of 848, do you have a statistic of how many, of course not. No, but that's a 10 to life sentence as well, and in this case- Of course not, you're, you're calculating the percentage of everyone from the lowest drug dealer on the street to the most dangerous kingpin and saying only 2.5% of all of those people get life sentences, so why is that comparable to a case in which the district court found that by a preponderance of the evidence, this was someone who not only participated in massive amounts of drug dealing, but also ordered and paid for five killings? Well- Is there a percentage that you can compare and say, oh, only 2% of people like that? No, but murderers don't get life as a matter of course. They don't, they, they get much less. The average, I think, for murderers is 20-something years. In this district, in this circuit, so it's not, so even for people who actually commit murders, not who, there is no evidence of anything ever happening other than money being paid for who knows what from an internet conversation, plus someone who's never sold any drugs, who created a platform for it, and is in a position of a landlord where a statute is a 20 or maximum, yes, a life sentence is unreasonable. Procedurally, the way the judge handled the, and also the overdose test, was we had a forensic, there's no forensic evidence, the but-for causation, United States v. Burrage, the Supreme Court case, 134-881, Supreme Court 881, which is about but-for causation. Even that's a- I wanna ask you about that specific thing. You fault the district judge for not, I think you say, striking from the pre-sentence report, the reference to five deaths, right? Yes. Supposing the judge had said, I agree with you, I will strike that. And then the judge said, in view of the quantity of narcotics we're talking about here, I'm taking judicial notice that out there in the world, there are people gonna die from an overdose. Would that be error? I think in the context of a life sentence, it would be error, it is error. Why does the sentence make the reference to the likelihood, or the inevitability even, of overdose make it error? I think the gravity, as this court has recognized, the gravity of the error is related- Why does it make it error in the first place? You're assuming it's error when you say the gravity of the error. Why is it error for a judge to say, in a case involving a large quantity of narcotics, there are bound to be some overdose deaths? Because I think that that creates a disparity, number one, because it's immeasurable, it's unquantifiable, it's not standardized in any way- Disparity between what and what? Between this defendant and any other defendant in a narcotics case. Those are not considerations that are, even in a high-volume narcotics case, in my experience, those are not considerations that courts have, and it's unquantifiable, it's speculative. It's completely speculative. You don't know that they don't have them. They may not always articulate it. But what is wrong, why is it error for a judge to simply say, I take these crimes very seriously, and one reason I do is that narcotics often lead to deaths? Well, I think that even if it's not error, and I think it is error here, but the life sentence makes it error because of the gravity of the change in the sentence. In other words, by saying you deserve a life sentence for that is error, and that's unreasonableness of its own capacity. Also, and it's connected to the nature of the proof, because if you don't have the proof and you speculate and then you dismiss all of the evidence that we put in mitigation, and you dismiss the 100 letters that were submitted on this defendant's behalf as it is, she said she was moved by it. How do you say she dismissed it? Well, she dismissed, she certainly dismissed all of the evidence of mitigation about the site. She took the exact opposite position without any basis other than, I mean, as a judge, she's entitled to have her own opinion, but the point is, it has to be based on some evidence, and all of the expert evidence that we put in in terms of sociologists, in terms of the medical, was completely opposite. The government presented no forensic evidence, no pathologists. There was nothing about these overdose deaths that contested our pathologists saying they're not sufficiently proved as relating to the Silk Road. So all of these factors led the court down a road of, again, procedural unreasonableness into substantive unreasonableness, and when you think sufficient but not greater than necessary, was a life sentence necessary here? No, it's not necessary. Thank you. We'll hear from the government. May it please the court, my name is Eunyoung Choi, and I represent the United States on appeal. Ross William Albrecht was caught red-handed running Silk Road. At the time of his arrest, the defendant was logged in as Red Pirate Roberts on the Silk Road servers, and was chatting as Dredd from his personal laptop with an undercover agent posing as a Silk Road employee. Not one of the arguments the defendant raises on appeal undermines a confidence in the jury's swift verdict, which was the only verdict that was consistent with the evidence presented at trial, the overwhelming evidence presented at trial, most of which was not even challenged on appeal. And that evidence, and it's important to note this, was called from a variety of different sources, and definitively established that Ross William Albrecht and Dredd Pirate Roberts were one and the same. Now, Mr., with regard, sorry, with regard to the issues surrounding the integrity of the electronic evidence, Mr. Dreitel brings up two points. One, he talks about the laptop, and he concedes that there is enormous trove of evidence on the laptop itself, that there is no evidence anywhere in the record, or in the subsequent investigations of the Baltimore Task Force. That undermines the integrity of that evidence, the chats that tie Albrecht to the identity of Dredd Pirate Roberts, all the- Didn't the Baltimore Task Force share some information about the investigation with the Southern District? I think, it depends on what you mean by share, so- Okay, we'll ask you more specifically. There were chats that a force was involved with that were communicated to the Southern District, is that correct? Yes, because they were in the form, oh, in a variety of reasons. First, they were in the form of various DEA-6 reports, in which they were produced in Rule 16 discovery to the defendant, in order to give him the full panoply of the statements the defendant had, in fact, made. So, if they were relevant to your investigation, why aren't they relevant to the trial? Well, with regard to that, the relevance comes from the fact that they're defendant's own statements. The trial itself, none of the evidence the government relied upon at trial was derived in any way from the Baltimore Task Force agents or their investigation, and I think that's an important point, because, at best, the arguments that Mr. Dreitel raises on appeal are speculative as to what might have been proven, or what could hypothetically have been true, but the fact of the matter is, those investigations have been ongoing. We have continued to recognize our Brady obligations, and we have not uncovered, in any part of our investigation of the servers, or in any part of the San Francisco investigation of those agents, any evidence that undermines the integrity of the server data. Why isn't the fact that something could have been done was practical or accomplishable? Why isn't that something that could raise a reasonable doubt in a jury, assuming there is evidence that this treasure trove of evidence could have been planted? Why is that not something the jury should hear about? Well, I think that ties into the question of alternative perpetrator, and whether or not, if you were just to hypothetically assume that something might potentially have occurred, whether or not the district court erred in saying you need to have a sufficient nexus to an actual potential alternative perpetrator. Otherwise, it would be highly prejudicial. I mean, you could see a realm in which, if Mr. Dreitel were able to simply insinuate that because these officers were corrupt in stealing Bitcoin, they had somehow magically planted evidence against Ulbricht, that would be highly prejudicial in the jury's consideration of whether or not Ulbricht was the Thread Pirate Roberts. It would cause confusion, and it would become a sideshow as to the corruption of those agents, as opposed to the. But what about the experts? I mean, I understand the point that it's sort of great for the defense, atmospherically, to be able to say there was a corrupt government agent involved somewhere, because that makes the government look bad. But unless that agent can be shown to have done something relevant to this case, it's not really a sculptor. I understand that point. But I'm asking a broader point. Mr. Dreitel's major thesis here is that the defense was prevented from putting on evidence that digital data is not necessarily what it seems. Now, you may be gonna tell me that that didn't happen, that the defense was not prevented from doing that, and I'd like to hear about that. But assuming that if he were right, wouldn't that be a problem? Well, I think it has to be placed in the context of what the district court was presented with, with regard to adequate notice in Rule 702. So it has to be, so we have to deal with, in other words, concretely the question of what exactly is it that the defense tried to present, question by question, expert by expert, and was it admissible or not, and did it actually prevent the defense from making the general point that there are vulnerabilities in digital evidence? Yes, Your Honor, and to be clear, the defense did make that point through cross-examination of, for example, the computer scientist from the FBI, Thomas Kiernan. They made the point that there could be potential security vulnerabilities, but what's important to note is that at no point, not even today, has Mr. Dreitel been able to articulate the precise opinion that they would have proffered from those defense experts that shows that, in fact, the metadata on the servers was undermined, in fact, that there was evidence that was planted against Ulbricht. And I think, given that, at best, it's a hypothetical abstract as to whether or not there could potentially have been an opportunity, I think that the district court was well within her bounds to say that Rule 702 had not been met, that she couldn't play her gatekeeping role because there weren't any opinions that had been proffered. How can she evaluate whether or not those opinions would be valid, would be reliable, and would help the jury in their deliberations if the defense can't even articulate what those. What's your answer to the defendant's view that some of this evidence was a surprise at trial, and so they couldn't have anticipated it enough to disclose these experts fully? Yes, Your Honor, I think there's sort of two points to be had here. One is that, at best, that could only really relate to, I think, perhaps the Bitcoin expert of the two, which is what Mr. Dreitel was insinuating. The district court, at multiple points, gave them the opportunity, despite the late disclosure, to actually articulate opinions, to articulate what precisely the experts would have said. But even in their opposition to the motions the government made to strike that expert testimony, at no time did they actually articulate those opinions. So I don't think that tardiness is really the question here. It's that at no point could 702 or 403, the rules of evidence, be actually. Yeah, I'm glad you said it, my view was this isn't about lateness of the disclosures, because if it were, it seems to me it would be rather easy to have a, I've been a district judge, it's never easy to have a continuance. But given the magnitude of the crimes charged, it seems to me a continuance would have been appropriate. But it's when you look at the actual disclosures of Mr. Belovin's proposed testimony, the closest you get to some concrete opinion is that he would testify to the import of some lines of PHP code provided to Defense and Discovery without telling us what the import is supposed to be or how Dr. Belovin arrived at whatever conclusion he might have had about what the import was. That seems to be much more of a problem than fencing back and forth about who surprised whom and whether this was late or not. Precisely, Your Honor, and to note, the servers in the laptop were available 10 months before the start of trial to Defense counsel. They had that period of time to make these arguments with regard to particular opinions as to the security vulnerabilities of either the server or the laptop, and they didn't do that. And I understand that obviously they don't have a burden to put on a defense, but nonetheless, when they open on the theory that there is a magical elf who is planting evidence or is undermining the digital integrity of this data, they actually must have some reason for that. And I think the fact that they had such late disclosure of opinions that were not actual opinions, just sort of topics of discussion, it was more than enough reason for the district court to exclude those particular experts from testifying. And with regard to- Can you talk about the sentence a bit? I mean, it is unusual for a young man in his early 30s with no criminal record who himself was not dealing drugs, except I think some mushrooms early on, and this, at least the evidence suggested that, to receive a life sentence. Isn't that quite a leap to have that kind of sentence imposed? Your Honor, I don't think that it is. I think we cite certain authorities that are briefed at page 154 that are along the lines of what Judge Lynch was describing with regard to the role and the scope of this particular enterprise. I mean, this is an individual who described this ship, this ship that is Silk Road, which was an unprecedented scale, an anonymous website that allowed for its users to purchase all sorts of illegal goods, not just the drugs. He described himself as the capital of the ship, he described the sellers there as his own business partners, and he made a profit from every single one of those transactions. This was not a passive person who created a premises on which those drugs could be sold. He was an active participant. And I note, Your Honor, that with regard to the life sentence, I mean, if you look at the probation report there, with regard to the PSR, the PSR offense conduct level was above the 43, the offense level of 43, which would have been the maximum. They recommended a life sentence in light of all of the specific characteristics of this offense, including those murders for hire that are really not challenged on appeal, but for perhaps the weight that the district court gave them. And I think given the scope of the drugs that were at issue here, the fact that this was an individual who policed his own rules. Well, you had, the government had this evidence of what seems to me extraordinarily disturbing behavior in the, abhorrent behavior in the murder for hire cases. But the, one way of reading the sentencing proceedings as a whole is they get kind of hijacked by the overdose deaths. That's where you have live victim impact testimony coming in of a very serious nature. I mean, your heart necessarily goes out to the parents of these overdose victims. But as Judge Newman suggested, isn't that something that's really a potential in every drug case? And isn't that a possibility allowed for by the extraordinarily severe sentences available for drug dealing? And when you harp on that, when you emphasize that in this case, it's not just a theoretical possibility, but there were in fact overdoses that more or less can be attributed to these particular drugs. Isn't that just the luck of one particular drug dealer who, where the overdose eventuated in fact, and the government finds out about it, and the victim's relatives are prepared to come forward and testify, that creates an enormous emotional overload on something that is effectively present in every sale of heroin case. Yes, Your Honor, and I think it's a fact that district court judges rely upon every day in sentencing drug defendants. I think the distinction here is that. But then why does that mean this guy gets a life sentence, and somebody else who is shown to have dealt X kilograms of heroin, where in principle, statistically, you would expect that somebody probably overdosed on some of that heroin somewhere. That guy doesn't, because this is the one where it just so happened that maybe, because the defense presents somewhat, well, it presents expert test by saying it really wasn't, or it wasn't sufficiently proven. Doesn't that put an extraordinary thumb on the scales that shouldn't be there in this case? Well, Your Honor, two points. One is specific to this case. I think that those victims were put forward in order to directly contradict the defense's argument that there was harm reduction in Silk Road, that this was a benevolent enterprise by the defendant in this case. And so I think in that context, it was appropriate, and as it is in any case, because the defendant finds, takes their victims as they find them. I mean, that is, that consideration was in direct response with defendant's argument. But putting that aside for a second, I think that once we start to double, to second guess the weight that was given to the import of the overdose deaths, that's precisely what this court does not do. The weight that is given to any particular otherwise considered 3553A factor is not something that is second guessed on appeal because the judge is the one who, and the district court judge is the one who is traditionally given deference with regard to making those decisions as to how much weight a particular factor should be given. And putting aside the overdose deaths, I think there is no real argument that the other specific characteristics of this offense and this defendant, his role, the scope, the number of drugs, really place him outside the purview of any even normal kingpin case that we would prosecute. I mean, this is unprecedented. The amount of drugs, the amount of harm that was imposed by Silk Road, and the fact that he did so deliberately and with a personal profit. Would you say it again, what's the argument they made to which this evidence was responsive? Oh, that Silk Road was a harm reduction enterprise. A what? A harm reduction enterprise in the sense that it was safer for people to purchase drugs on Silk Road, that it was an anonymous forum where they could talk about their addictions. I mean, I think that those six particular individuals, and especially the heroin addicts among them. They had a doctor you could talk to. Correct, they had a doctor that they could talk to which presents its own problems. Putting that aside for a moment, there are specific examples within those six overdose deaths that are of heroin addicts. And there are other parts of the record in which Ross Ulbrich not only knew about the fact that people were addicted to heroin and purchasing these drugs on Silk Road, but was callous and indifferent to that fact. And I think that those- Was there any factual challenge to those six deaths that was described for us in the briefs that there was pretty clear evidence that this was Silk Road heroin that was used that caused the deaths of those folks? Was there any challenge by the defendant saying, no, you haven't shown that this is not just heroin obtained from another source. You have not shown that this is Silk Road heroin or other drugs? There wasn't any. There was some LSD substitute drugs, I think, too, right? There was a variety of drugs, but there was never any challenge, reasonable though, or even now about the source of the drugs that were at issue. Well, the challenge was different, right? The challenge was absent a full autopsy and better medical examiner expert testimony, you don't know that the guy who was sitting in front of his computer looking at the message that said his order was being delivered with a package from the Silk Road torn up and a needle in his arm and dead didn't just happen to have a stroke while he was shooting up for reasons independent of the heroin. Isn't that the kind of expert testimony? The argument that the defense expert, Dr. Taff, made was really conclusions about the degree of medical certitude that you could ascribe forensically to these particular deaths. I think that's a different question than generally the broad nature of the factors the district court can consider in determining the specific characteristics of the offense. But that's the actual argument that was made, not that it was somebody else's heroin, but that we can't say for sure what the cause of death was. Correct. And we conceded, I think, that with regard to meeting the statutory requirements of a but-for cause, perhaps we would not have been able to meet that, but under the circumstances, it wasn't that these victims were used for anything other than to illustrate the straightforward point that there were consequences to the drugs that were on Silk. Well, here you're doing a preponderance of the evidence proof for the judge as to how to evaluate these factors, which is different than saying that Mr. Ulbricht could have been convicted of homicide on these crimes. Correct. And there's no clear error in those actual facts. Is this sentence, unlike non-life sentences, subject to parole? Not subject to parole, Your Honor. No federal sentences since 1984 are subject to parole. I believe that's correct. And you're sure that applies to a life sentence? I believe that's the case, Your Honor. Anything else you had? No, thank you. All right, thank you. You had some time for rebuttal? Yes, thank you, Your Honor. And I'll move quickly. With respect to the force stuff, there were 14 government exhibits initially that related to force that they pulled after this issue became live. With respect to the cross-examination with peer experts and the preclusion, the judge stopped me in the middle and said, you can put somebody on in front of the jury, he said, you can put somebody on to do that. And then when we tried, we were precluded. With respect to the alternative perpetrator, it's not speculative, the government had probable cause, the government got warrants, the government could have charged this person under the standard of probable cause. That was very early on in the investigation. There was testimony about that. It was. That the principal witness said, we thought it was somebody else for a while, we actually sought a warrant, but then when we got into the investigation more, we decided that wasn't the appropriate target. It was, they signed, the prosecutor in this case, in the Southern District, signed a warrant application, probable cause for that person, six weeks before they arrested Mr. Ulbricht. So this is not early in the investigation. What kind of warrant? A warrant of arrest? A warrant of search? It was a search warrant. A search warrant. For email accounts and probable cause, they believe that person was dread pirate robbers. You know, even the government didn't ask for a life sentence. The government asked for a substantial sentence above the mandatory minimum of 20. The harm reduction, this is very important. The harm reduction was litigated before we ever filed a sentencing memorandum. So they were not responding to anything. They told us early on, we're putting these five overdose deaths in. We litigated that before we filed our sentencing memo about harm reduction or anything. That was our response. We're trying to ameliorate the impact of those, and I agree with you, Your Honor, 100% having been there. It hijacked the sentencing entirely. And you all have tremendous experience in the district court sentencing, and you know what it's like in those proceedings. With Anthonopoulos, two letters at page 349 and 380 of the appendix. Those are our letters. I think they're sufficiently detailed. Let me be clear about the sequence you just said. Yes. The first time you, in defense, ever raised the issue of harm reduction was? Our sentencing memorandum. And this came after you were notified of there would be evidence of the deaths? Not only notified, after we actually briefed that issue. We briefed that issue preliminarily prior to any sentencing memorandum being filed. That was a preliminary issue that we litigated. Well, all right, leaving aside your specific, whatever it was, piece of paper that talked about harm reduction, prior to their raising the indication of proof of deaths, had you said in any communication anything about the sort of benign purposes of this operation? No. Nothing? No. And...  just one of the things is that in terms of what could have or would have, you know, we weren't allowed to investigate. We weren't allowed to subpoena. We were foreclosed from pursuing it. So what we could have found and what we could have done, it just wasn't, it's just not a fair way to have a trial. So, thank you, Your Honor. Thank you. We'll reserve decision.